# UNITED STATES DISTRICT COURT

for the

_____ District of _____

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i></td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.</td></tr>
</table>

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

The residence located at 16208 Cornuta Avenue, Apartment #19, Bellflower, California, 90706, to include the residence, surrounding curtilage, and any storage facilities found upon the property.  The residence is located within an apartment complex located on Cornuta Avenue between Alondra Boulevard and Flora Vista Street in Bellflower, California.  Apartment #19 is on the second floor of the northernmost row of apartments in the complex.  The exterior staircase leading to the door of Apartment #19 is south facing.  Apartment #19 also has a small balcony on the south side of the unit, facing a small courtyard. The balcony is covered by the roofline and is open-air, but has no access from the ground level.

## ATTACHMENT B

**I. ITEMS TO BE SEIZED**

1.     The items to be seized are the fruits,
instrumentalities, and evidence of violations of 18 U.S.C.
§ 371: Conspiracy, 18 U.S.C. § 875(d): Transmitting Threatening
Communications with Intent to Extort, 18 U.S.C. § 1951(a):
Extortion Affecting Interstate Commerce, and 18 U.S.C. §
1952(a)(3): Use of an Interstate Facility to Facilitate Unlawful
Activity (the "SUBJECT OFFENSES"), namely:

a.     Documents and records reflecting the identity of,
contact information for, communications with, or times, dates or
locations of meetings with co-conspirators or victims, including
calendars, address books, telephone or other contact lists, hard
copy correspondence, notes, emails, text messages, social media
messages, communications on messaging applications, photographs,
and videos (including items stored on digital devices).

b.     Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show address book information, including all stored or saved
telephone numbers.

c.     Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from the any digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls.

d.     Documents and records reflecting the identity of,

contact information for, communications with, or times, dates or locations of meetings with co-conspirators, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, emails, text messages, social media messages, communications on messaging applications, photographs, and videos (including items stored on digital devices).

e.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any digital device.

f.   Records, documents, programs, applications, or materials showing payment, receipt, concealment, transfer, or movement of money generated from the SUBJECT OFFENSES, including documents written in vague or coded language, and including bank account records, wire transfer records, bank statements, pay-owe sheets, receipts, safe deposit box keys and records, money containers, financial records, and notes.

g.   Audio recordings, pictures, video recordings, or still captured images relating to the transfer or laundering of the proceeds of the SUBJECT OFFENSES.

h.   Contents of any calendar or date book.

i.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

j.   Any indicia of occupancy, residency, or ownership of the SUBJECT RESIDENCE and any containers or digital devices found therein, including, forms of personal identification,

iv

immigration records, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, keys, letters, mail, cancelled mail envelopes, personal belongings, and personal photographs.

k.   Records, documents, programs, applications, or materials showing payment, receipt, concealment, transfer, or movement of money generated from online extortion, including documents written in vague or coded language, and including bank account records, wire transfer records, bank statements, pay-owe sheets, receipts, safe deposit box keys and records, money containers, financial records, and notes.

l.   Audio recordings, pictures, video recordings, or still captured images relating to online extortion and the collection, transfer or laundering of the proceeds of the SUBJECT OFFENSES.

m.   Any indicia of occupancy, residency, or ownership of any other premises or locations used to facilitate the SUBJECT OFFENSES, including forms of personal identification, immigration records, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, personal belongings, and personal photographs.

n.   Records, documents, programs, applications or materials relating to the ownership, occupancy, or use of any vehicle used to facilitate the SUBJECT OFFENSES and/or articles

v

of personal property tending to establish the identity of
person(s) in possession or control of any vehicle used to
facilitate the SUBJECT OFFENSES, including vehicle insurance
documents, vehicle registration documents, department of motor
vehicle documents, maintenance receipts, parking tickets,
vehicle code violation tickets, purchase, lease, or rental
agreements, loan payment receipts, keys, letters, mail, personal
belongings, and personal photographs.

      o.  Records, documents, programs, applications or
materials, including bills and subscriber documents, related to
digital devices used to facilitate the SUBJECT OFFENSES.

      p.  Any digital device used to facilitate the SUBJECT
OFFENSES and forensic copies thereof.

      q.  With respect to any digital device used to
facilitate the SUBJECT OFFENSES or containing evidence falling
within the scope of the foregoing categories of items to be
seized:

      i.  evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.   records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

    3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing

data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; peripheral input/output devices, such
as keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices,
such as modems, routers, cables, and connections; storage media,
such as hard disk drives, floppy disks, memory cards, optical
disks, and magnetic tapes used to store digital data (excluding
analog tapes such as VHS); Global Positioning System ("GPS")
devices and navigation systems; and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) to an appropriate law
enforcement laboratory or similar facility to be searched at
that location.  The search team shall complete the search as
soon as is practicable but not to exceed 120 days from the date
of execution of the warrant.  If additional time is needed, the
government may seek an extension of this time period from the
Court on or before the date by which the search was to have been
completed.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

c.   When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

d.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

e.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

f.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

h.   The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

i.   Notwithstanding the above, after the completion of the search of the digital devices, the government shall not

access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, law enforcement personnel are authorized to 1) depress the fingerprints and/or thumbprints of WILSON onto the fingerprint

sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device; and 2) hold the device in front of the face of WILSON with his eyes open to activate the facial-, iris-, and/or retina-recognition feature of the device.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, James Rubstello, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for search warrants to search the residence located at 16208 Cornuta Avenue, Apartment #19, Bellflower, California, 90706 (the "SUBJECT RESIDENCE"), as further described in Attachment A-1, and a 2018 Dodge Charger bearing Vehicle Identification Number 2C3CDXBG0JH197077 (the "SUBJECT VEHICLE"), as further described in Attachment A-2.

2.    As further described in Attachment B, the requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 371: Conspiracy, 18 U.S.C. § 875(d): Transmitting Threatening Communications with Intent to Extort, 18 U.S.C. § 1951(a): Extortion Affecting Interstate Commerce, and 18 U.S.C. § 1952(a)(3): Use of an Interstate Facility to Facilitate Unlawful Activity.  Attachments A-1, A-2, and B are incorporated by reference.

3.    The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF SPECIAL AGENT JAMES RUBSTELLO

4.   I am a Special Agent of the Computer Crime Investigative Unit, United States Army Criminal Investigation Command ("USACIDC"), and have been working out of the Fort Huachuca, Arizona office since July 2016.  In addition to my training as a criminal investigator, I am trained in computer incident response, digital evidence acquisition, and computer forensics.  Prior to becoming a Special Agent, I was employed as the senior digital forensic analyst and computer incident responder for United States Army information systems in the continental United States.  For six years, I worked with and directly supported criminal investigations into network-based attacks and intrusions.  I maintain digital forensic certifications from Guidance Software and the Global Information Assurance Certification program.

5.   I received four months of criminal investigator training while attending the USACIDC Special Agent Course.  I have also received specialized training in money laundering and asset forfeiture.  During my time as a Special Agent, I have conducted investigations involving online extortion through digital means and I am experienced with the actions and methods used by criminals to facilitate online fraud.  As a Special Agent of USACIDC, I am authorized to investigate crimes involving violations of the Uniform Code of Military Justice, and other applicable federal laws where there is an Army interest.

2

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On Nov 8, 2017, USACIDC received a complaint that M.D., an active duty soldier in the United States Army stationed at Fort Riley, Kansas, transferred $23,800 to DAMAIN BERNARD WILSON ("WILSON") in order to prevent the public release of nude photos and videos of M.D.  WILSON lives at the SUBJECT RESIDENCE and the SUBJECT VEHICLE is registered to WILSON.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.   Based on my review of bank records, subpoena results, social media posts, my discussions with other law enforcement officers and agents, as well as my own observations and knowledge of the investigation, I am aware of the following:

**A.   Online Extortion of M.D.**

8.   Based on a review of a complaint filed by M.D. with USACIDC, I learned the following:

a.   On or about Oct 25, 2017, M.D. was contacted through the MeetMe online dating application by a MeetMe user displaying the username "Nycole C".  "Nycole C" and M.D. began a conversation that eventually moved to the Kik instant messaging mobile application.  On Kik, M.D. sent "Nycole C" nude images and videos of himself and "Nycole C" sent M.D. nude images of a female in return.

b.   Ultimately, M.D. told "Nycole C" that he felt uncomfortable about the situation and asked "Nycole C" to delete the nude images and videos.  In response, "Nycole C" stated she would post the images and videos to social media if M.D. did not

pay her $1000.   "Nycole C" directed M.D. to pay $1000 through the
Venmo application to Venmo username "Strictly Business
@hediedforme" and M.D. complied.

        c.   After M.D. paid $1000 through Venmo, "Nycole C"
told M.D. that she was only 15 years old.   Shortly after that
communication, a Kik user displaying the username "Donotdistrubme"
and the display name "Jeffrey Calazo" contacted M.D. via the Kik
application and claimed to be the cousin of "Nycole C".   "Jeffrey
Calazo" threatened to tell the police that M.D. sent lude images
to an underage female unless M.D. paid him money.   Specifically,
"Jeffrey Calazo" directed M.D. to make seven money transfers
totaling $22,800 to a Navy Federal Credit Union (NFCU) account and
M.D. complied.

     **B.   Further Investigation**

    9.   After M.D. reported the above information to USACIDC
investigators, I sought and obtained NFCU bank statements and
learned that the NFCU account where M.D. deposited funds belonged
to WILSON.   Those NFCU statements confirmed that a total of
$22,800 traveled from M.D.'s account to WILSON's account on seven
occasions between October 25, 2017 and November 6, 2017.

    10.   M.D. told USACIDC investigators that he communicated
with "Nycole C" on phone number 562-373-4577.   The phone number
is leased to Pinger Inc., which provides internet-based voice and
text services.   I obtained account documents associated with
phone number 562-373-4577 from Pinger Inc. and learned that the
name "Damains 7" was used to register the account.

11. A search of law enforcement databases revealed WILSON was interviewed by Duplin County, North Carolina's Sheriff's Office on February 5, 2015 regarding his alleged involvement in an extortion case. Based on my review of a report filed in that case, I learned that WILSON was suspected of controlling a Kik account with the username "Alexis Nicole Calazo" that was used to extort a Duplin County resident. I obtained account documents from MeetMe associated with the account for username "Nycole C" and learned that the account was registered using the email address "ncalazo@aol.com".

C.   **Identification of SUBJECT RESIDENCE and SUBJECT VEHICLE**

12. Based on a search of law enforcement databases, I learned that since early 2018, WILSON has lived at the SUBJECT RESIDENCE. On or about September 25, 2018, I contacted the property manager of the SUBJECT RESIDENCE who confirmed WILSON has resided at the SUBJECT RESIDENCE for at least six months and resides there still.

13. On August 22, 2018, USACIDC Special Agents conducted surveillance of the SUBJECT RESIDENCE. During the surveillance, USACIDC agents observed the mailbox for the SUBJECT RESIDENCE had the name "Wilson" printed on it. Additionally, USACIDC agents observed the SUBJECT VEHICLE parked in a reserved parking spot for the SUBJECT RESIDENCE in the back of the apartment building. That vehicle appeared to be the same vehicle depicted recently on publicly-available social posts made on WILSON's social media accounts. On or about September 25, 2018, I queried the

California Department of Motor Vehicle's records and determined that the SUBJECT VEHICLE is registered to WILSON.

**V.   TRAINING AND EXPERIENCE REGARDING ONLINE FRAUD AND EXTORTION**

14.   Based on my training and experience and information obtained from other law enforcement officers who investigate fraud and extortion perpetrated over the internet, I know the following:

a.   The use of digital devices is essential to the crimes of online fraud and extortion.  As such, it is common practice for people engaged in online fraud and extortion to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) contacting potential victims; (2) maintaining online relationships with victims; (3) keeping records of the fraudulent schemes they use to extort victims, to include cataloguing transfers of money from victims via wire transfer or online money-sharing applications; (4) researching personal information, such as social security numbers and dates of birth, for potential victims; and (5) maintaining a catalogue of the contacts with their victims.  It is common to find such digital devices in fraudsters' residences and vehicles.

b.   People who engage in extortion and fraud often keep physical records, such as journals and notebooks, that catalogue

the schemes they engage in online.  These physical records serve
as a means of organizing previous contacts with victims and
maintaining a log of extortionate activity, to include money
transfers from victims into fraudsters' bank accounts and/or their
online money-sharing application accounts.  It is common to find
such physical evidence in fraudsters' residences and vehicles.

   c. Individuals who participate in online fraud and
extortion schemes often have co-conspirators, and often maintain
telephone numbers, email addresses, and other contact information
and communications involving their co-conspirators in order to
conduct their business.  Oftentimes, they do so on their digital
devices.  Suspects often use their digital devices to communicate
with co-conspirators by phone, text, email, and social media,
including sending photos.

### VI. <u>TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES</u>

  15. As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing data
in digital form, including central processing units; desktop,
laptop, notebook, and tablet computers; personal digital
assistants; wireless communication devices, such as telephone
paging devices, beepers, mobile telephones, and smart phones;
digital cameras; peripheral input/output devices, such as
keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices, such
as modems, routers, cables, and connections; storage media, such
as hard disk drives, floppy disks, memory cards, optical disks,

and magnetic tapes used to store digital data (excluding analog tapes such as VHS); Global Positioning System ("GPS") devices and navigation systems; and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises and/or vehicle it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment,

such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

     c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises and/or vehicle.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

     d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e.,

space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

          e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for

by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or of
a deleted portion of a file (such as a paragraph that has been
deleted from a word processing file).  Virtual memory paging
systems can leave digital data on the hard drive that show what
tasks and processes on the computer were recently used.  Web
browsers, e-mail programs, and chat programs often store
configuration data on the hard drive that can reveal information
such as online nicknames and passwords.  Operating systems can
record additional data, such as the attachment of peripherals, the
attachment of USB flash storage devices, and the times the
computer was in use.  Computer file systems can record data about
the dates files were created and the sequence in which they were
created.  This data can be evidence of a crime, indicate the
identity of the user of the digital device, or point toward the
existence of evidence in other locations.  Recovery of this data
requires specialized tools and a controlled laboratory
environment, and also can require substantial time.

        f.   Further, evidence of how a digital device has been
used, what it has been used for, and who has used it, may be the
absence of particular data on a digital device.  For example, to
rebut a claim that the owner of a digital device was not
responsible for a particular use because the device was being

controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

16.   I believe that digital devices will be found during the search of the SUBJECT RESIDENCE and/or the SUBJECT VEHICLE.   I know from my training and experience and my review of publicly available materials that Apple, Inc. ("Apple"), Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the devices, via biometric sensors (such as fingerprint scanners or facial recognition software).   Specifically, I know the following:

a.   Several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.   These biometric features include fingerprint-recognition, face-recognition, iris- recognition, and retina-recognition.   Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID.

c.   Apple also equips its iPhone X, which was released in fall 2017, with a facial-recognition feature that enables users to unlock the device with their faces.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential

13

to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Other companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d.   While not as prolific on digital devices as fingerprint and facial-recognition features, both iris and retina-scanning features exist for securing devices/data.  The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes.  The device is then unlocked if the camera detects the registered eye.

17.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because

they are considered a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered a more secure way to protect a device's contents.

18.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (a) more than 48 hours has passed since the last time the device was unlocked; (b) the device has not been unlocked via Touch ID or Face ID in 8 hours and the passcode or password has not been entered in the last 6 days; (c) the device has been turned off or restarted; (d) the device has received a remote lock command; (e) 5 unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (f) the user has activated "SOS" mode by rapidly clicking the right side button 5 times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

15

19.   For these reasons, if while executing the warrants, law enforcement personnel discover that a digital device that falls within the scope of the requested warrants must be unlocked using one of the aforementioned biometric features, the warrants I am applying for would permit law enforcement personnel to: (1) compel the use of the WILSON's thumb- and/or fingerprints on seized digital devices; and (2) hold the seized digital devices in front of WILSON's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

20.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

//

//

//

## VII. <u>CONCLUSION</u>

21.  For all of the reasons described above, there is probable cause to believe that WILSON has committed a violation of 18 U.S.C. § 371: Conspiracy, 18 U.S.C. § 875(d): Transmitting Threatening Communications with Intent to Extort, 18 U.S.C. § 1951(a): Extortion Affecting Interstate Commerce, and 18 U.S.C. § 1952(a)(3): Use of an Interstate Facility to Facilitate Unlawful Activity.  Additionally, there is probable cause to believe the items listed in Attachment B are evidence, fruits, and instrumentalities of the offenses described in Attachment B, and will be found in a search of the SUBJECT RESIDENCE described in Attachment A-1 and the SUBJECT VEHICLE described in Attachment A-2.

_____
James Rubstello,
Special Agent, USACIDC

Subscribed to and sworn before me
this ____ day of October, 2018.


_____
ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

17